O'MELVENY & MYERS LLP
Gerald C. Bender, Esq.
Shannon Lowry Nagle, Esq.
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Attorneys for Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------ x

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **ESCADA (USA) INC.,** | : | **Case No. 09-15008 (SMB)** |
| | : | |
| **Debtor.** | : | |
| | : | |

------------------------------------------------------------------ x

**DEBTOR'S MOTION PURSUANT TO SECTIONS 363 AND 365 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 FOR (i)
APPROVAL OF THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S
ASSETS, (ii) AUTHORIZATION TO ENTER INTO AGREEMENT IN
CONNECTION THEREWITH, (iii) APPROVAL OF THE ASSUMPTION
AND ASSIGNMENT, OR REJECTION OF EXECUTORY CONTRACTS
AND UNEXPIRED LEASES AND (iv) RELATED RELIEF**

Escada (USA) Inc., debtor and debtor in possession in the above-referenced chapter

11 case (the "Debtor"), with the support of the Official Committee of Unsecured Creditors (the

"Creditors' Committee") appointed in this case files this Motion pursuant to sections 363 and 365

of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6004 and 6006 of the Federal

Rules of Bankruptcy Procedure ("Bankruptcy Rules") and General Order M-383, establishing

guidelines for the conduct of asset sales (the "Guidelines"), requesting approval of a private sale of

substantially all of the Debtor's assets to the recent purchaser of its parent corporation, Escada AG,

as more particularly set forth herein (the "Sale Motion"). In support hereof, the Debtor

respectfully states as follows:

**<u>Preliminary Statement</u>**

1.      On December 1, 2009, after an extensive global marketing effort, the parent company of the Debtor, Escada AG, sold its assets in its German insolvency proceeding to HSBC Trustee (C.I.) Limited as trustees of the Royal II Trust, of 1 Grenville Street, St. Heller, Jersey, JE4 9PF, a subsidiary of the Mittal Family Trusts (the "<u>Purchaser's Affiliate</u>").  Since the closing of the Escada AG transaction, the Debtor's parent has ceased providing financial or marketing support to the Debtor.  Accordingly, the prompt sale of the Debtor's assets is necessary to maintain and to realize for the benefit of its estate its going concern value.  Absent a prompt sale, the value of the Debtor's assets will continue to decline and the Debtor will not have sufficient funding to continue operations.

2.      Purchaser's Affiliate expressed an interest in the Debtor's assets during negotiations with Escada AG.  After reaching agreement for the purchase of Escada AG, the Purchaser's Affiliate turned its efforts toward conducting due diligence and negotiating for the purchase of those subsidiaries of Escada AG that were not part of the sale by the Administrator (as defined below) for Escada AG.  After extensive due diligence and negotiations, Escada US Subco LLC (the "<u>Purchaser</u>"), a Delaware limited liability company formed by the Purchaser's Affiliate for purposes of acquiring the assets of the Debtor, made an offer dated December 21, 2009, and attached hereto as Exhibit A (the "<u>Agreement</u>").   The Agreement represents the culmination of nearly four (4) months of global marketing efforts and discussions over the terms pursuant to which Purchaser would purchase substantially all of the assets of the ESCADA Group as a going concern.  To effect this transaction, the Debtor with the support of the Creditors' Committee (as defined below) seeks approval of the sale to the Purchaser pursuant to the Agreement on an expedited basis.

3.    Because Escada AG was the Debtor's sole supplier of luxury retail fashions and the Debtor is not the registered owner or licensor of the "Escada" brand name, the Debtor believes a sale to the Purchaser represents the best opportunity for the Debtor to maximize the value of its assets for the benefit of its estate.

4.    The Debtor hopes to effectuate a sale of the Debtor's assets and business as a going concern, preserve its business operations in the United States, continue to employ a significant number of its approximately 235 employees, and maximize the value of its estate for its creditors.

5.    Accordingly, this Sale Motion has been filed on an expedited basis requesting (i) approval of the sale of substantially all of the Debtor's assets, (ii) authorization to enter into the Agreement in connection therewith, (iii) approval of the assumption and assignment, or rejection of executory contracts and unexpired leases, and (iv) related relief.

### Background

6.    The Debtor markets, distributes and sells ESCADA™ brand luxury apparel and fashion accessories.  It is a wholly-owned subsidiary of Escada AG, a publicly-held German corporation, doing business internationally as the "ESCADA Group".  Prior to December 1, 2009, Escada AG designed and manufactured, or licensed for manufacture, all merchandise sold by the Debtor.

7.    The Debtor historically purchased its merchandise from Escada AG and resold it in the U.S. through two channels of distribution: retail and wholesale.  The retail channel consists of 13 boutiques and 14 outlet stores operated by the Debtor at leased locations throughout the U.S.  At wholesale, the Debtor distributes luxury apparel and fashion accessories through Saks Fifth Avenue, Neiman Marcus and other specially selected department stores and independent retailers.

8.     As described in more detail in the *Declaration of Christian Marques Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and Applications* (Docket No. 2) (the "<u>First Day Declaration</u>"), the Debtor's business has been negatively affected by a number of significant factors, starting with the financial crises and its impact on luxury retailers and the financial distress of its parent company and sole supplier of merchandise, Escada AG.  These events have created a highly challenging retail environment for the Debtor since 2008.

9.     The ESCADA Group responded aggressively to the continued economic decline, and made every effort to preserve the value of its business in the face of unprecedented challenges to the retail industry.  When Escada AG's efforts to restructure its debt out of court were unsuccessful, it commenced an insolvency proceeding in Germany.  The preliminary insolvency administrator appointed in the German proceeding, Dr. Christian Gerloff (the "<u>Administrator</u>"), retained KPMG, professional advisors with substantial experience in working with troubled retailers, who undertook an exhaustive, global search for an equity investor or purchaser of the assets of the ESCADA Group, including the Debtor's assets.

10.     The Debtor, and the rest of the ESCADA Group, have endeavored to maintain their operations during the Escada AG marketing and sale effort.  Historically, the Debtor was wholly dependent on Escada AG for financial support, and the supply of inventory and promotional materials.  In recent years, the Debtor represented approximately 20% of the sales of the ESCADA Group.  Therefore, KPMG included the Debtor's business in the marketing process in an effort to obtain the maximum value for the ESCADA Group.

11.     KPMG's efforts involved contacting over 180 potential purchasers or investors that were thought to have a financial or strategic desire to acquire or invest in the ESCADA Group.

12.     KPMG negotiated confidentiality agreements with approximately 50 interested parties.  These parties were provided with a confidential information memorandum which served as a "pitch piece" for the ESCADA Group.

13.     Approximately 30 of these potential purchasers were provided access to an electronic data room containing sufficient information about the Debtor and the entire ESCADA Group in order for the potential purchasers to conduct due diligence.

14.     In Germany, offers were received from several potential purchasers. Counsel for the Creditors' Committee and Debtor met with officers of Escada AG, representatives of the Administrator and several interested parties in Germany to provide information about the process for acquiring the Debtor.

15.     On or around November 5, 2009, KPMG concluded the sale effort.  The Purchaser's Affiliate executed an asset purchase agreement with Escada AG to purchase substantially all of the assets of Escada AG.   The sale closed on December 1, 2009.  The Administrator determined that it was not realistic or practical, given the time and financial limitations on the Administrator and the pendency of this chapter 11 case, to include the Debtor's assets in the sale process in Germany.  The Debtor, and the other subsidiaries of Escada AG that were not part of the sale by the Administrator for Escada AG, were left to negotiate for individual asset sales.

16.     The Agreement with the Purchaser represents the culmination of those efforts.  The Debtor and the Creditors' Committee conducted extensive negotiations with the

Purchaser and considered various alternatives to the Agreement. As a result, the Debtor concluded at this juncture that the proposed sale is the best offer for the Debtor's assets and the best way to maximize the value of the estate for its creditors.

17. Time is of the essence. The sale of the Debtor's parent company and sole supplier has created exigent circumstances. The Debtor does not operate on a positive cash flow basis and has traditionally relied on support—financial as well as marketing and inventory support—from its parent to maintain operations. Accordingly, the Debtor concluded, in the exercise of its business judgment, and with the support of Creditors' Committee, that a private sale to the Purchaser is in the best interests of the estate, and represents the best opportunity for the Debtor to maximize the value of the estate for its creditors.

## Relief Requested

18. By this Motion, the Debtor seeks entry of the Sale Order in a form substantially similar as the one attached hereto as Exhibit B:

(a) approving the sale of substantially all of the Debtor's assets to the Purchaser pursuant to the Agreement;

(b) approving the assumption and assignment of executory contracts and unexpired leases in connection with the Sale or, alternatively, rejection of contracts and leases;

(c) finding that the Purchaser or other successful bidder is a "good faith purchaser," as that term is defined in section 363(m) of the Bankruptcy Code, and has not violated section 363(n) of the Bankruptcy Code; and

(d) waiving the ten day stay requirements of Bankruptcy Rules 6004(h) and 6006(d).

19.     The Agreement provides for the purchase of substantially all of the Debtor's assets, the assumption and assignment of the majority of the Debtor's prepetition contracts and unexpired leases, and the assumption of various liabilities as more specifically described in the Agreement (collectively, as defined in the Agreement the "Transferred Assets").

20.     The Guidelines provide, among other things, that a sale motion "must highlight material terms" of the proposed Agreement and Sale Order.  The Debtor submits that the description of the material terms of the Agreement and Sale Order set forth herein complies with the Guidelines.  By way of summary, the primary terms of the Agreement are set forth below:[1]

21.     Pursuant to section 2.1(a) of the Agreement, the Purchaser will acquire substantially all of the Debtor's assets that are owned, held or used by the Debtor in connection with its business including accounts receivable, contracts, leases, equipment, fixtures, furniture and inventory, as more particularly set forth in the Agreement.

22.     Pursuant to section 2.1(b), the primary, but not only, assets that the Purchaser will **not** be acquiring are (i) all cash and cash equivalents, including the Debtor's bank accounts, certificates of deposit, refunds and other prepaid assets, (ii) income tax refunds, if any, (iii) security and other recoverable deposits other than those arising from or in connection with the Debtor's real property leases that are assumed and assigned to Purchaser, and (iv) all claims and rights under insurance policies (including, without limitation, insurance premium refunds).

23.     The Agreement provides for the assumption by the Debtor and the assignment to the Purchaser of the majority of the Debtor's executory contracts and unexpired

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Agreement. The description of the material terms of Agreement set forth herein are for summary purposes only and the terms of the Agreement shall control in all circumstances.

leases pursuant to section 2.1(e) (as defined in the Agreement, the "Assumed Contracts"). A preliminary determination of the contracts that will be Assumed Contracts is reflected on the list of prepetition contracts and unexpired leases attached hereto as Exhibit C (the "Contracts"). Postpetition, the Debtor has negotiated approximately five (5) amendments to unexpired leases, which have not been executed. These amendments are noted on Exhibit C (the "Amended Contracts") and the Debtor intends to assume and assign the Amended Contracts as amended. All Contracts not assumed by the Purchaser will be rejected by the Debtor, subject to the terms of the Agreement (the "Rejected Contracts"). The Agreement provides that the Purchaser shall have until three (3) days prior to the Closing to designate a Contract as an Assumed Contract or Rejected Contract. If amendments to the Amended Contracts are not finalized in a manner satisfactory to the Purchaser, the Purchaser may reject the Amended Contracts.

24.     Pursuant to Article VIII of the Agreement, Purchaser has agreed to make written offers of employment, effective as of the Closing, to at least 80% of Debtor's current employees. All employment offers will be at initial wages and benefits that are substantially comparable in the aggregate to the benefits in effect for each such employee immediately prior to Closing (except for equity compensation and, with respect to certain employees with individual severance arrangements, severance benefits). Although the Purchaser will not be assuming liabilities with respect to the Debtor's current employee benefit plans, Purchaser has agreed to make available or establish new employee benefit plans for all hired employees and their eligible dependents. For purposes of eligibility and vesting, if applicable, Purchaser will recognize the service date of each hired employee to the same extent as that service credit would have been given under the Debtor's plans.

25.     Included in the assets being purchased is the Debtor's customer list.  The Debtor maintains a list of customers' contact information for those customers desirous of receiving promotional materials including sale announcements from the Debtor and Escada AG.  As set forth in the Agreement and Sale Order, the Purchaser agreed to become the Debtor's successor-in-interest as to the customer information and to use the customer information only in accordance with the privacy policy of the Debtor.

26.     The Transferred Assets include "<u>Avoidance Actions</u>" and similar rights and causes of action arising under sections 544 through 553 of the Bankruptcy Code subject to the Purchaser's agreeing not to pursue such actions.  While the Debtor has not conducted a comprehensive analysis of Avoidance Actions, the Debtor does not believe significant Avoidance Actions exist, if any.  Prior to the commencement of its chapter 11 case, the Debtor was operating in the ordinary course of business and paying its vendors and customers pursuant to terms.  More importantly, the Purchaser negotiated for the purchase of the Avoidance Actions as part of the sale because it will be transacting business with the same vendors and customers and needs to preserve the relationships therewith.

27.     The consideration the Debtor will receive under the Agreement is set forth in section 3.1 of the Agreement and summarized follows:

(i)      $6 Million U.S. Dollars, plus

(ii)     The assumption of the Assumed Liabilities, plus

(iii)    Reimbursement for new inventory purchased by the Debtor from and after the execution of the Agreement to Closing, subject to the inventory post-Closing adjustment provision contained in Section 3.5 of the Agreement.

28.     The Agreement contains a number of provisions governing the termination rights of the parties, which are set forth in Section 4.2 of the Agreement.  In general, the Agreement may be terminated under the following circumstances:

(i)     At any time prior to the Closing Date by the joint written consent of Seller and Purchaser;

(ii)     By either Seller or Purchaser if the Closing has not occurred on or before January 15, 2010 (as may be extended by written agreement of the Parties, the "Outside Date"); provided, however, that the terminating Party is not in breach of its obligations hereunder in any material respect;

(iii)     By either Seller or Purchaser, if the Purchaser is not selected as the successful bidder in any auction related to the Transferred Assets or the Bankruptcy Court shall enter an Order approving a Competing Transaction;

(iv)     By either Seller or Purchaser, if there shall be any Applicable Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited (and such law is not overturned or otherwise made inapplicable to the transactions contemplated hereby within a period of one hundred twenty (120) days) or if an Order is entered by a Governmental Authority of competent jurisdiction having valid enforcement authority permanently restraining, prohibiting or enjoining either party from consummating the transactions contemplated hereby and such Order shall become final and non-appealable; provided however that the right to terminate the Agreement under this Section 4.2(d)  of the Agreement shall not be available to a party if such restraint, prohibition or enjoinment is primarily due to the failure of such party to perform any of its obligations thereunder;

(v)     By Purchaser, so long as Purchaser is not then in breach of its obligations hereunder in any material respect, upon a material breach of any covenant or agreement of Seller set forth herein, or if any representation or warranty of Seller shall have been or becomes untrue in any material respect with respect to representations and warranties with no materiality qualifier, or in any respect for representations and warranties with materiality qualifiers, in each case such that the conditions set forth in Section 9.2(a) or Section 9.2(b) of the Agreement, as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(vi)     By Seller, so long as Seller is not then in breach of its obligations under the Agreement in any material respect, upon a material breach of any covenant or agreement of Purchaser set forth in the Agreement, or if any representation or warranty of Purchaser shall have been or becomes untrue in any material respect with respect to representations and warranties with no materiality

qualifier, or in any respect for representations and warranties with materiality qualifiers, in each case such that the conditions set forth in Section 9.3(b) or Section 9.3(c), as the case may be, would not be satisfied and such breach or untruth cannot be cured by the Outside Date;

(vii)    By Purchaser, if the Sale Order shall not have been entered by the Bankruptcy Court on or prior to January 15, 2010;

(viii)    By Purchaser, if the Bankruptcy Case shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in this bankruptcy case;

(ix)    By Purchaser, if Seller breaches the non-solicitation provisions of Section 7.5 in any material respect; or

(x)    By Seller, if Purchaser does not deposit the Escrow Amount with the Escrow Agent within two (2) Business Days hours following the execution of the Agreement in accordance with Section 3.2(a) of the Agreement.

29.    In addition to the termination provisions outlined above, Article IX of the Agreement sets forth conditions that must be satisfied prior to Closing.  Among other things, the Purchaser is not required to close the Sale if the Sale Order is not entered in form and substance reasonably acceptable to the Purchaser or if an order is entered staying, reversing, modifying, revoking, vacating, rescinding or amending the Sale Order in a manner unacceptable to the Purchaser.

30.    The Guidelines require the disclosure of, among other things, the material terms of agreements between the management of the Debtor and the Purchaser.  While initial discussions regarding retention of senior management have taken place, no agreements have been reached as of the date of the filing of this Motion.  However, to the extent that such arrangements are executed prior to the Sale Hearing, the Debtor will disclose the material terms of such arrangements to the Court and the Creditors' Committee at or prior to the Sale Hearing.  Since the purchase price for the Sale has already has been negotiated, the Debtor would submit that any

future arrangements between the Debtor's management and the Purchaser does not affect the fairness of the Sale.

31.     Pursuant to section 7.6 of the Agreement, each of the Debtor and Purchaser are required to preserve the records of the assets to be sold for a period of three years after Closing and to make such records and any employees with knowledge thereof available to the other party for such period of time.  Part of the assets excluded from the Sale pursuant to section 2.1(b) of the Agreement is the Debtor's books and records and any other corporate governance, organization, and capitalization documents not related primarily to the Debtor's business or required to be maintained by the Debtor pursuant to applicable law.

32.     Pursuant to section 7.5 of the Agreement, the Debtor agrees not to (i) solicit, initiate, or knowingly encourage any proposal or offer from any other person relating to a Competing Transaction, (ii) furnish any information, assist or participate in any effort relating to a Competing Transaction, or (iii) support approval of a motion or order inconsistent with the transaction contemplated by the Agreement.  The Debtor agreed to the "no solicitation" provision as a necessary aspect of the sale.  The Debtor believes agreeing to such a provision in light of the facts of this case, specifically in light of the extensive marketing push conducted in Germany leading to the acquisition by the Purchaser's Affiliate of Escada AG, the Debtor's sole supplier of inventory and the registered owner of the intellectual property related to the brand sold by the Debtor, is in the best interest of the estate and consistent with its fiduciary duties.

### The Proposed Sale Order

33.     The proposed Sale Order attached hereto as Exhibit B also contains certain provisions that require disclosure pursuant to the Guidelines.

34.     The Guidelines provide that a sale motion highlight "anti-successor liability" provisions in a sale order.  Paragraphs L and 11 of the Sale Order contain such anti-successor liability provisions for the benefit of the Purchaser.  Again, the Debtor submits that such language is standard in bankruptcy sale transactions.  The Debtor will have significant unpaid prepetition unsecured claims after the Closing of the Sale.  No buyer would be willing to purchase the Debtor's assets if the buyer were at risk that the holders of such claims could sue the buyer for successor liability.  In addition, the Debtor is providing direct notice of the sale to all known creditors of the estate.  As such, the Debtor submits that the notice of the proposed "no successor liability" findings in the Sale Order is adequate as to all potentially affected parties.

35.     Finally, the Sale Order provides for a waiver of the ten (10) day stay period for the effectiveness of the order under Bankruptcy Rule 6004(h), as well as the ten (10) day stay period provided for in Bankruptcy Rule 6006(d).  For the reasons set forth herein, the Debtor submits that cause exists for such waivers.

36.     The Debtor believes that the Agreement represents the best possible outcome for this case.  The proposed Sale ensures that the Debtor will be able to monetize their going concern value and the business will continue receiving inventory and related support of its retail operations from the parent company.  If the Debtor is not able to sell its business at this time, it likely will not be able to maintain its operations.  As a result, the sale at this time not only maximizes the value of the estate, but also ensures the preservation of jobs nationwide.  The preservation of jobs, when possible, is an important element of any successful chapter 11 case.  See In re Chateaugay Corp., 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996) (noting that "Public policy, as evidence by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and

rehabilitation of troubled companies and the concomitant preservation of jobs and going concern").

## **Assumption and Assignment of Executory Contracts and Unexpired Leases**

37.     To facilitate and effect the Sale, the Debtor seeks authority to assume and assign the majority of its contracts and leases to the Purchaser.  The Debtor seeks authority to (i) establish the amount of any cure obligations, if any, necessary to be paid in accordance with section 365 of the Bankruptcy Code for those Contracts that will be assumed (the "Cure Amounts"), and (ii) establish objection deadlines for the counterparties to the Contracts proposed to be assumed and assigned.

38.     Exhibit C includes (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) any applicable cure amount (the "Cure Amounts"), and (iv) a nonbinding designation of whether the Contract will be assumed or rejected by the Purchaser.  All counterparties to the Contracts will be served with a copy of this Motion and the Exhibits thereto so they will be on notice of the proposed assumption, assignment and Cure Amounts, if any, and the proposed method of providing adequate assurance of future performance.

39.     As set forth herein, the Purchaser is Escada US Subco LLC, an entity formed to acquire the Debtor.  The Purchaser is related to the Purchaser's Affiliate, purchaser of Escada AG and Escada UK, Ltd. and intends to continue providing the Debtor's business with luxury retail fashions and related retail support in its capacity as the new owner of the Debtor's assets.   Any counterparty to a Contract entitled to adequate assurance of future performance desirous of receiving additional information should contact the Debtor in advance of the Objection Deadline (as defined below) in order to receive additional information.

40.     Any objections to the assumption and assignment, or rejection of any Contract, including to the Cure Amount set forth on such schedule or the method of providing adequate assurance of future performance, must be in writing, filed with the Court, and be actually received by the Notice Parties not later than the Objection Deadline.  If no objection is timely received, (x) the counterparty to the Contract shall be deemed to have consented to the assumption, assignment or rejection of the Contract and shall be forever barred from asserting any objection with regard to such assumption, assignment or rejection, and (y) the Cure Amount set forth on Exhibit C shall be controlling, notwithstanding anything to the contrary in any Assumed Contract, or any other document, and the counterparty to the Assumed Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Assumed Contract against the Debtor or the Purchaser, or the property of any of them.

41.     The "Notice Parties" are (i) the chambers of the Honorable Chief Judge Stuart M. Bernstein of the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004; (ii) O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attention: Gerald C. Bender (email: gbender@omm.com) and Shannon Lowry Nagle (snagle@omm.com), attorneys for the Debtor; (iii) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Elisabetta Gasparini and Paul K. Schwartzberg); (iv) Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY 10169, Attention: William M. Silverman, Esq. (wsilverman@oshr.com) and Melanie L. Cyganowski, Esq. (mcyganowski@oshr.com), attorneys for the official committee of unsecured creditors appointed in this case; and (v) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006 (Attention: Sean A. O'Neal, Esq.) (soneal@cgsh.com), attorney for the Purchaser.

42.     Objections, if any, to the relief sought in this Sale Motion must be made in writing, with a hard copy to Chambers, conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the Southern District of New York and be filed with the Bankruptcy Court and must be served in accordance with the Administrative Order, Pursuant to Bankruptcy Rule 1015(c), Establishing Case Management and Scheduling Procedures in these cases (Docket No. 39) (the "Case Management Order") so as to be actually received by the Notice Parties not later than one day prior to the Sale Hearing (the "Objection Deadline").

43.     Except as otherwise provided herein, any Contract designated as a Rejected Contract on or before three (3) days prior to the Closing will be deemed rejected and terminated as of the Closing.  Any counterparty to a contract or lease that is moved from the Assumed Contract designation to the Rejected Contract designation will be notified in writing within three (3) days of the Closing.  If a nonresidential real property lease is ultimately rejected pursuant to the Sale Order, the rejection date will be the later of the Closing or the date upon which the Debtor surrenders the premises to the landlord in a broom clean condition with any necessary keys or access codes.  The Debtor requests that the Court establish a bar date that is thirty (30) days after entry of the Sale Order for counterparties to Rejected Contracts to file any and all claims against the Debtor resulting from the rejection of the Contracts, or any other claims or damages relating to the Rejected Contracts.

44.     Pursuant to the Agreement, the Debtor is directed to (i) change its name such that the term "Escada" is not used, and (ii) revise the caption of this chapter 11 proceeding to reflect the new name of the Debtor.  The Debtor requests authority in connection with the Closing, to change its name, and any amendment to the organizational documents (including the certificate

of incorporation) of the Debtor to effect such a change is authorized and approved, without Board or shareholder approval. Upon such change, the Debtor proposes to file with the Court a notice of change of case caption within two (2) business days of the Closing, and the change of case caption for this chapter 11 case will be deemed effective as of the Closing.

45. If a timely objection to assumption or rejection of a Contract is received and such objection cannot otherwise be resolved by the parties, the Court may hear such objection at the Sale Hearing, or any later date set by the Court. The pendency of a dispute relating to Cure Amounts will not prevent or delay the assumption and assignment of any contracts or leases. If an objection is filed solely with respect to the Cure Amount listed on Exhibit C, the dispute with respect to the Cure Amount will be resolved consensually, if possible, or, if the parties are unable to resolve their dispute, by the Court. If a dispute relating to Cure Amounts is not resolved, the Purchaser may choose to assume the Contract (in which case it shall be come an Assumed Contract), or may determine to delete the Contract from the list of Contracts that may be assumed. The Debtor intends to cooperate with the landlords of the leases and counterparties to contracts to attempt to reconcile any differences.

## Applicable Authority

### I. Disposition of the Debtor's Assets Under Section 363 of the Bankruptcy Code is Warranted

46. Ample authority exists for the approval of the proposed disposition of the Debtor's assets through a sale to the Purchaser. Section 363 of the Bankruptcy Code, which authorizes a debtor to use or sell assets of the estate other than in the ordinary course of business, free and clear of liens, claim and encumbrances, provides, in relevant part, as follows:

> The trustee, after notice and a hearing, may use,
> sell, or lease, other than in the ordinary course of
> business, property of the estate . . . .

See 11 U.S.C. § 363 (b)(1); see Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction").

47.     The decision to dispose of assets outside the ordinary course of business is based upon the sound business judgment of the Debtor.  See e.g., In re Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992); The Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 772 F.2d 1063, 1071 (2d Cir. 1983); In re Adelphia Commc'ns Corp., No. 02-41729 (REG) (Bankr. S.D.N.Y. July 31, 2002) (Doc. No. 253).  See also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.), 147 B.R. 650, 656 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993), quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) ("the business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company," which has continued applicability in bankruptcy").

48.     In analyzing valid business justifications, applicable principles of law attach to a debtor's decision and a strong presumption exists "that in making a business decision[,] the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  In re Integrated Res., Inc., 147 B.R. at 656 (holding that the Delaware business judgment rule has "vitality by analogy" in chapter 11). Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor in possession has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  See Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Schs., Inc.), Case No. 96 Civ. 3576 (PKL), 1997 WL 188127, *4 (S.D.N.Y. Apr. 17, 1997); accord In re

Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Decorda Indus., Inc., Case No. 00-4459, 2002 WL 32332749, at *3 (Bankr. D. Del. May 20, 2002).

49.     A debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for the distribution of the proceeds of sale, especially if there is a need to preserve the going concern value because revenues are not sufficient to support the continued operation of the business and there are no viable sources for financing.  See Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., --- U.S. --- n.2, 128 S. Ct. 2326, 2331 n.2, 171 L.Ed.2d 203 (2008); In re General Motors Corp., 407 B.R. 463, 488-93 (Bankr. S.D.N.Y. 2009); In re Chrysler LLC, 405 B.R. 84, 96 (Bankr. S.D.N.Y. 2009), aff'd 576 F.3d 108 (2d Cir. 2009), cert. granted, judgment vacated, appeal dismissed as moot, --- S. Ct. ---, 2009 WL 2844364 (2009). Numerous sales seeking to preserve going concern value have been approved in this district. See e.g., Chrysler, 405 B.R. at 96; In re General Motors Corp., Case No. 09-50026 (REG), Dkt. No. 2968; In re Silicon Graphics, Inc., Case No. 09-11701 (MG), Dkt. No. 292; In re Bearing Point, Inc., Case No. 09-10692 (REG); In re Metaldyne Corp., 409 B.R. 671 (Bankr. S.D.N.Y. 2009).

50.     Ample business justification exists in this case to approve the proposed Sale and related transactions.  The Debtor has considered all alternatives, with the assistance of counsel and with significant involvement from counsel to the Creditors' Committee, and determined that the immediate sale of substantially all of its assets as a going concern to the Purchaser is in the best interest of the Debtor's estate and creditors.  In order to preserve and maximize the value of the Debtor's assets, the Debtor believes that the disposition of its assets must be completed in the timeframe described herein.

## II.    Sale of Assets Free and Clear of Liens, Claims and Encumbrances

51.    In the interest of obtaining the best offers, a sale of the Debtor's assets, including, without limitation, the Debtor's inventory, furniture, fixtures and equipment, must be free and clear of any and all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims and encumbrances attaching to the proceeds of the Sale.  Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

- applicable nonbankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)(5).

52.    The Debtor does not believe that there are any liens on any of its assets but with respect to any party asserting a lien, claim, or encumbrance against any of the Debtor's assets, the Debtor anticipates that they will be able to satisfy one or more of the conditions set forth in section 363(f).

53.    The sale of the Debtor's assets will satisfy section 363(f) of the Bankruptcy Code because any entities holding liens on the Debtor's assets will have received notice of this Motion.  All parties in interest will be given sufficient opportunity to object to the relief requested, and any such entity that does not object to the Sale should be deemed to have consented.  See

Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285-86 (7th Cir. 2002) cert. denied, 538 U.S. 962 (2003) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent.  It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); Hargrave v. Township of Pemberton (Matter of Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); see also In re Enron Corp., Case No. 01-10634 (AJG), 2003 WL 21755006, at *2 (Bankr. S.D.N.Y. July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).  As such, to the extent that no party holding a lien objects to the relief requested in the Sale Order, the sale of the assets free and clear of all liens, claims and encumbrances except any liabilities expressly assumed by the Purchaser satisfies section 363(f)(2) of the Bankruptcy Code.

54.     Accordingly, any sale of the Debtor's assets will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

### III.    The Purchaser Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

55.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an
> authorization under [section 363(b)] … does not
> affect the validity of a sale … to an entity that

> purchased … such property in good faith, whether
> or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale …
> were stayed pending appeal.

11 U.S.C § 363(m).

56.     The Bankruptcy Code does not define the "good faith" that protects transactions pursuant to section 363(m).  However, the Second Circuit explained that the "[G]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings."  Licensing By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 390 (2d Cir.1997) (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir.1978)); accord id. (noting also that the relevant fraudulent, collusive actions are those "specifically intended to affect the sale price or control the outcome of the sale."); Chrysler, 405 B.R. at 106; General Motors, 407 B.R. at 494.

57.     Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., Case No. 92 CIV. 7054 (PKL), 1993 WL 159969, at *3 (S.D.N.Y. May 10, 1993) (quoting In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143, 147 (3d Cir. 1986)).  See also Allstate Ins. Co v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, wether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

58.     The selection of the Purchaser for the acquisition of the Debtor's assets was the product of arm's-length, good-faith negotiations in a competitive purchasing process.  The

Debtor intends to request at the Sale Hearing a finding that the Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## IV.     A Consumer Privacy Ombudsman is Not Required

59.     Under section 363(b)(1), a debtor may sell or lease its consumer customer list so long as it complies with the debtor's privacy policy.  11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent with the debtor's privacy policy, section 332 governs the appointment of a consumer privacy ombudsman.  11 U.S.C. § 363(b)(1).  As set forth above, the Debtor intends to sell consumer customer information in a manner consistent with it privacy policy so no consumer privacy ombudsman is required.

## V.     Approval of the Assumption and Assignment or Rejection of the Contracts is in the Best Interest of the Estate

60.     To facilitate and effect the sale of its assets, the Debtor seeks authority to assume and assign certain contracts and leases to the Purchaser.  Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject an executory contract or unexpired lease."  11 U.S.C. § 365(a).  A debtor's determination to assume or reject an executory contract is governed by the "business judgment" standard.  See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the product of bad faith, whim or caprice).

61.     The business judgment rule has vitality in chapter 11 cases and shields a debtor's management from judicial second-guessing.  See Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) (finding that the Bankruptcy Code favors a presumption of reasonableness

in a debtor's management decisions). Upon finding that the debtor has exercised its sound business judgment in determining that assumption or rejection of the leases is in the best interest of the debtor, its creditors and other parties in interest, the Court should approve assumption or rejection of the leases under section 365(a) of the Bankruptcy Code. See, e.g., Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

62.     In addition, section 365 of the Bankruptcy Code authorizes the proposed assumptions and assignments, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(f)(2).

63.     The words "adequate assurance of future performance' must be given a "practical, pragmatic, construction" through "consideration of the facts of the proposed assumption." In re Fleming Cos., 499 F.3d 300 (3d Cir. 2007) (quoting Cinicola v. Scharffenberger, 248 F.3d 110, 120 n.10 (3d Cir. 2001)). See also Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989) (same); In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that the debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

64.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property

assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of a lease from debtor has

financial resources and has expressed a willingness to devote sufficient funding to business in

order to give it strong likelihood of succeeding chief determinant of adequate assurance is whether

rent will be paid).  See also In re Vitanza, Case No. 98-19611DWS, 1998 WL 808629, at *26

(Bankr. E.D. Pa. Nov. 13, 1998) ("The test is not one of guaranty but simply whether it appears

that the rent will be paid and other lease obligations met.")  In addition, where the leased premises

are in a shopping center, a debtor assigning such lease must meet the heightened definition of

adequate assurance of future performance in section 365(b)(3) to ensure that "[t]he essential terms

of a debtor's lease in a shopping center [are] not . . . changed in order to facilitate assignment."  In

re Rickel Home Ctrs., Inc., 209 F.3d 291, 298 (3d Cir. 2000), cert. denied, 531 U.S. 873 (2000)

(internal quotations and citations omitted).

       65.     As set forth above, the Debtor intends to satisfy the requirements of section

365(f)(2).

       66.     The Purchaser is a wholly-owned subsidiary of Lenzty Investments SARL,

a Luxembourg *société à responsabilité limitée*, the parent of the Purchaser's Affiliate.  Affiliates

of the Purchaser are expected to purchase substantially all of the assets and business of the

ESCADA Group.  The Purchaser and its Affiliates have made and are making a significant

investment in the global business of the ESCADA Group.  It is anticipated that most, if not all

counterparties to contracts will readily accept the Purchaser as a viable and acceptable transferee

of the Contracts.  In addition, to the extent a counterparty to a Contract requires additional

information with respect to the Purchaser's ability to perform under an Assumed Contract, the

Debtor proposes to provide additional information so long as the counterparty makes such request to counsel for the Debtor prior to the Objection Deadline.

67.     The Debtor anticipates the Assumed Contracts will be assumed and assigned and the Rejected Contracts will be rejected, subject to the Purchaser's right to modify the existing designations three (3) days prior to Closing.  The counterparties to all Contracts will receive notice of this Motion and an opportunity to object, as well as a method of obtaining sufficient information with respect to the Purchaser's adequate assurance of future performance.  The assignment procedures detailed herein will ensure that all parties against whom relief is sought will have ample notice of such relief and an opportunity to contest any asserted Cure Amount, as well as the adequacy of the adequate assurance provided.  Consequently, the Debtor submits that the assumption and assignments or rejections are fair and reasonable in light of the circumstances and should be approved.

**VI.     The Court Should Waive or Reduce the Periods Required by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure**

68.     Pursuant to Rule 6004(h) of the Bankruptcy Rules, unless the court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order.  Fed. R. Bankr. P. 6004(h).  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. 6004(h).  Similarly, Bankruptcy Rule 6006(d) stays all orders authorizing a debtor to assign an executory contract or unexpired lease pursuant to section 365(f) of the Bankruptcy Code for 10 days, unless the court orders otherwise.  Fed. R. Bankr. P. 6006(d).

69.     As described above, the Sale pursuant to the Agreement is part of a global purchase of substantially all of the assets of the ESCADA Group.  The assets of the Debtor's

parent company and some of its subsidiaries have already been sold and in order to ensure continued operations of the business, a continued supply of inventory and financial support, and to maintain the employees' jobs, the Sale must close promptly. Consequently, any order approving the Agreement should be effective immediately by providing that the 10-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

### Notice

70.     No trustee or examiner has been appointed in this chapter 11 case. The Debtor has served notice of this Motion on (i) the Office of the United States Trustee for the Southern District of New York, (ii) the attorneys for the Creditors' Committee, (iii) the U.S. Attorney for the Southern District of New York, (iv) all parties on the Debtor's 2002 service list, (v) all other affected federal and local regulatory and taxing authorities, including the Internal Revenue Service, (vi) all attorney general's offices in the states in which the Debtor does business, and (vii) all parties to Contracts. The Debtor submit that no other or further notice need be provided.

71.     No previous request for the relief sought herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: December 21, 2009                     Respectfully submitted,
      New York, New York

/s/ Gerald C. Bender
O'MELVENY & MYERS LLP
Gerald C. Bender, Esq.
Shannon Lowry Nagle, Esq.
Times Square Tower
7 Times Square
New York, NY 10036
Telephone:  (212) 326-2000
Facsimile:  (212) 326-2061

Attorneys for Debtor and Debtor-in-Possession