| UNITED STATES BANKRUPTCY COURT | Hearing Date: April 29, 2010 |
| SOUTHERN DISTRICT OF NEW YORK | Hearing Time: 10:00 a.m. |

-------------------------------------------------------x
:
In re : Chapter 11
:
EUSA LIQUIDATION INC., : Case No. 09-15008 (SMB)
(f/k/a Escada (USA) Inc.) :
:
                            Debtor. :
:
-------------------------------------------------------x

**MOTION OF THE UNITED STATES TRUSTEE FOR AN ORDER
TO CONVERT THIS CHAPTER 11 CASE TO CHAPTER 7**

TO: THE HONORABLE STUART M. BERNSTEIN,
      UNITED STATES BANKRUPTCY JUDGE:

Diana G. Adams, the United States Trustee for Region 2 (the "United States Trustee"), in furtherance of her duties and responsibilities prescribed by Section 586 of title 28 of the United States Code, hereby moves this Court, pursuant to section 1112(b) of the Bankruptcy Code, for an order converting this Chapter 11 case to a Chapter 7. In support thereof, the United States Trustee respectfully represents and alleges as follows:

**I. INTRODUCTION**

The United States Trustee brings this motion to convert this Chapter 11 case to a case under Chapter 7 based upon the fact that the Debtor has sold substantially all of its assets, is presently not operating, and all that remains to be done in the case is possibly pursue some causes of action – to the extent there are any claims – and distribute the limited "pot" of funds to the various creditors. Despite the fact that the Debtor has promised to file a plan and disclosure statement since shortly after the sale of substantially all of the Debtor's assets was consummated in mid-January 2010, a plan has yet to be filed. Moreover, while the Creditors' Committee has indicated that they are

prepared to file a plan and disclosure statement in the imminent future, proceeding with the confirmation of a plan as opposed to a conversion to Chapter 7 does not appear to benefit the unsecured creditors. In fact, since the sale of the Debtor's assets was consummated, the constituencies have retained or are seeking to retain additional professionals. The administrative expenses related to the wind-down in the Chapter 11 would undoubtedly be higher than those related to a Chapter 7. Accordingly, the United States Trustee seeks the conversion of the case pursuant to 11 U.S.C. §1112(b)(4)(A) as a result of the continuing loss of estate funds and inability of the Debtor to rehabilitate.

Moreover, the Debtor has failed to file monthly operating reports for the past 2 months. Accordingly, "cause" for conversion to Chapter 7 is also warranted under 11 U.S.C. §1112(b)(4)(H).

## II. FACTUAL BACKGROUND

1. On August 14, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is authorized to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1008 of the Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 case.

2. The Debtor is primarily engaged in the merchandising and selling of imported designer women's apparel through retail boutiques, outlet stores and wholesale distribution channels throughout the United States.

3. On September 3, 2009, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee"), pursuant to Section 1102(a)(1) of the Bankruptcy Code. See ECF Doc. 51. On September 21, 2009, as a

result of the resignation of two members, the United States Trustee amended the appointment of the Creditors' Committee. See ECF Doc. 77.

4. On December 21, 2009, the Debtor entered into an Asset Purchase and Sale Agreement with Escada US Subco, LLC for the sale of substantially all of its assets (the "Sale Transaction"). The Sale Transaction contemplated the sale of all of the Debtor's assets with the exception of (a) all cash and cash equivalents, (ii) income tax refunds, (iii) security and other recoverable deposits, and (iv) all claims and rights under insurance policies. See Debtor's Motion Pursuant to Sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 for (i) Approval of the Sale of Substantially All of the Debtor's Assets, (ii) Authorization to Enter into Agreements in Connection Therewith, (iii) Approval of the Assumption and Assignment, or Rejection of Executory Contracts and Unexpired Leases, and (iv) Related Relief (the "Sale Motion"), ECF Doc. 171, ¶22. The consideration the Debtor received under the Sale Transaction consisted of $6 million in cash, the assumption of certain assumed liabilities, and the reimbursement for new inventory purchased by the Debtor from and after the execution of the purchase agreement to closing. See Sale Motion at ¶27.

5. On January 7, 2010 – within five (5) months of the Petition Date, the Court approved the Debtor's sale motion (the "Sale Order"). See ECF Doc. 200. In accordance with the Sale Order, the Debtor filed a Notice of Change of case caption from Escada (USA), Inc. to EUSA Liquidation Inc. See ECF Doc. 220.

6. On January 15, 2010, the Debtor closed on the Sale Transaction. Id. at ¶6.

7. The Debtor's business operations have ceased and, since the closing of the Sale Transaction, the focus of the Debtor and the Creditors' Committee has turned to the

formulation of a liquidation plan. See ECF Doc. 238 at ¶7. To date, however, no plan and disclosure statement have been filed with the Court.

**Plan and Disclosure Statement**

8. On November 18, 2009, the Debtor filed its first motion pursuant to section 1121 of the Bankruptcy Code seeking the extension of exclusivity to file a plan. See ECF Doc. 139. By Order entered on December 2, 2009, the Court granted the extension of the Debtor's exclusivity to file a plan to and including February 12, 2010 and extended the Debtor's exclusive solicitation period to and including April 12, 2010. See ECF Doc. 156.

9. On February 2, 2010, the Debtor filed a second motion seeking a further 45-day extension of their exclusive periods under section 1121 (the "Second Exclusivity Motion"). See ECF Doc. 227. In the Second Exclusivity Motion, the Debtor asserted that given that it had only recently consummated the sale of its assets, it had not had sufficient time to formulate a plan. Id. at ¶19. Moreover, the Debtor indicated that it would be in a position to present a plan within "the next few weeks." Id.

10. On February 16, 2010, the Creditors' Committee filed an objection to the Second Exclusivity Motion. See ECF Doc. 248. In the objection, the Creditors' Committee argued that the plan to be formulated in this case "should not be overly complex, or controversial, since the distribution in this case will likely be from one single 'pot' for virtually all creditors.'" Id. at ¶7. Moreover, the Creditors' Committee indicated that it was willing to prepare and file a disclosure statement and plan in the event exclusivity was denied. Id. at ¶9.

11. At the hearing on the Second Exclusivity Motion held on February 23,

2010, the Court denied the request sought in the Second Exclusivity Motion and terminated exclusivity. Despite the representations at the hearing that the filing of a plan and disclosure statement were imminent, to date no plan or disclosure statement have been filed.[1]

**Administrative Professional Costs of Chapter 11 Proceeding**

12. By Order entered on September 15, 2009, O'Melveny & Myers LLP ("OMM") was retained as restructuring counsel to the Debtor pursuant to section 327(a) of the Bankruptcy Code. See ECF Doc. 70.

13. By Order entered on October 9, 2009, Otterbourg, Steindler, Houston & Rosen, P.C. ("Otterbourg") was retained as counsel to the Creditors' Committee effective as of September 8, 2009. See ECF Doc. 109.

14. By Order entered on December 15, 2009, Follick & Bessick, P.C. was retained to serve as special counsel to the Debtor *nunc pro tunc* to the Petition Date. See ECF Doc. 167.

15. On February 9, 2010, the Creditors' Committee sought the retention of Clingman & Hanger Management Associates, LLC ("Clingman") as wind-down advisor to the Creditors' Committee (the "Clingman Retention Application"). See ECF Doc. 238. An order approving the Clingman Retention Application was entered on March 2, 2010. See ECF Doc. 262.

16. Clingman was retained prior to the confirmation of a plan in order to, among other things, familiarize itself with the books and records of the Debtor, analyze the Debtor's assets and liabilities and identify possible assets for realization, and assist

---

[1] The United States Trustee has been informed by counsel to the Creditors' Committee that they will be filing a liquidating plan and a related disclosure statement in the near future.

5

the Creditors' Committee in the plan and disclosure statement process. Id. at ¶17. Moreover, the Clingman Retention Application states that it is expected that, to the extent a plan of liquidation is proposed and confirmed, Clingman will be appointed as the plan administrator. Id. at ¶11.

17. As compensation for its services, Clingman will receive fixed monthly rates of: (a) $40,000 a month for the first two months of its retention, (b) $30,000 a month for the third and fourth month, (c) $25,000 a month for the fifth and sixth month, and (d) $20,000 a month for all months thereafter. Id. at 13. Moreover, under the terms of its retention, Clingman is authorized to use the services of individuals employed by Professional Staffing LLC or independent contractors at an hourly rate passed through to the Debtor's estate at cost. Id. at 4.

18. On February 9, 2010, the Debtor also sought authority to enter into an executive employment agreement with Christian D. Marques (the "Employment Agreement"), previously employed by the Debtor as its Chief Financial Officer. See ECF Doc. 236. The Employment Agreement was approved by an order entered on March 17, 2007. See ECF Doc. 277.

19. Pursuant to the Employment Agreement, Marques will continue his employment with the Debtor for at least six-months, until July 15, 2010, as the Debtor's President and Treasurer. See id., Amended and Restated Employment Agreement. As compensation for his services, he will receive a salary at an annualized rate of $450,000 as well as other benefits. Id., §3.1.

20. On March 16, 2010, the Debtor also filed an Application for Order Authorizing Employment of Togut, Segal & Segal, LLP (the "Togut Firm") as Special

Conflicts Counsel to the Debtor (the "Togut Firm Retention Application"). See ECF Doc. 272. Contemporaneously with the filing of this Motion, the United States Trustee filed an objection to the Togut Firm Retention Application questioning the necessity of the firm's services and raising concerns with respect to the duplication of the proposed work to be provided.

21. The Debtor also filed an application to retain the firm of PricewaterhouseCoopers LLP ("PwC") as their independent auditors (the "PwC Retention Application"). See ECF Doc. 157. The Creditors' Committee objected to PwC's retention on the basis that, among other things, the Debtor did not derive any benefits from the services provided by PwC. See ECF Doc. 251. The PwC Retention is scheduled to be heard on March 30, 2010, at the same time the Togut Firm Retention Application is scheduled to be heard.

Monthly Operating Reports

22. The Debtor has failed to file monthly operating reports for the months of January and February 2010. According to the Debtor's December 2009 monthly operating report (the "December MOR"), the Debtor had cash on hand in the amount of approximately $6.7 million and total assets in the amount of $41,725,847. See ECF Doc. 230. The December MOR also reflects total net losses for the month of December 2009 in the amount of $413,956 and cumulative net losses since the Petition Date in the amount of $22,096,042. Id.

23. The monthly operating reports for the prior months also reflect a continuing decrease in assets and increasing net losses over the pendency of the Chapter 11 proceeding. The chart below reflects the total value of assets, the net monthly net

losses, and the cumulative net losses as reflected in the monthly operating reports:

| Period of MOR | Total Assets | Net Loss for MOR Period | Cumulative Net Loss |
|---|---|---|---|
| August 14 - 31, 2009 ECF Doc. 81 | $57,498,316 | $(2,676,812) | n/a |
| September 2009 ECF Doc. 133 | $57,787,572 | $(3,096,329) | $(5,773,141) |
| October 2009 ECF Doc. 154 | $42,786,301 | $(15,466,432) | $(21,239,573) |
| November 2009 ECF Doc. 197 | $41,996,292 | $(442,513) | $(21,682,086) |
| December 2009 ECF Doc. 230 | $41,725,847 | $(413,950) | $(22,096,042) |

A copy of each monthly operating report filed in this case is attached hereto as Exhibits 1 through 5.

### III. ARGUMENT

This case should be converted to a Chapter 7. Section 1112(b) of the Bankruptcy Code governs the conversion or dismissal of a Chapter 11 case and grants bankruptcy courts the power to promptly administer chapter 11 cases on their docket. See In re Squires Motel, LLC, 416 B.R. 45 (Bankr. N.D.N.Y. 2009); In re Strawbridge, 2010 WL 779267, at *1 (Bankr. S.D.N.Y. March 5, 2010). It provides that, on request of a party in interest, and after notice and a hearing, "the court shall convert a case under [Chapter 11] to a case under chapter 7 or dismiss [it], whichever is in the best interest of creditors and the estate, if the movant establishes cause." 11 U.S.C. §1112(b)(1) (emphasis added); see also In re Scott Cable Communications, Inc., 407 B.R. 8, 15 (Bankr. D. Conn. 2009) ("Once cause for relief is shown, the Court has broad discretion to either convert or dismiss the Chapter 11 case.").

While the term "cause" is not defined by the statute, section 1112(b)(4) provides some examples which are meant to be non-exclusive, and any one of which may

constitute "cause" for either the conversion of a Chapter 11 case to a Chapter 7 case or the dismissal of a Chapter 11 case in its entirety. See In re Ameribuild Const. Management, Inc., 399 B.R. 120, 132 (Bankr. S.D.N.Y. 2009). While the burden of showing cause rests with the moving party, In re Loco Realty Corp., No. 09-11785(AJG), 2009 WL 2883050, at *2 (Bankr. S.D.N.Y. June 25, 2009), that burden can be met either by demonstrating the existence of one or more of the statutory grounds enumerated in 11 U.S.C. §1112(b) or by showing other cause. See 11 U.S.C. §1112(b)(4); In re TCR of Denver, LLC, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) (noting that "the Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause'"); In re State St. Assocs., L.P., 348 B.R. 627, 638 (Bankr. N.D.N.Y. 2006) (while the list of examples of "cause" has changed in the 2005 amendment, the fact that they are illustrative, not exhaustive, has not).

>Among other things, "cause" includes:
>
>>(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation
>>
>>. . .
>>
>>(H) Failure timely to provide information or attend meetings reasonably required by the United States Trustee.

11 U.S.C. §1112(b)(4). Ample cause exists to convert this case to Chapter 7 on these grounds.

**A.     The Debtor is Continuing to Lose Money and There is No Reasonable Likelihood of Rehabilitation**

Cause exists to convert this case pursuant to section 1112(b)(4)(A) of the Bankruptcy Code because there is a "substantial or continuing loss or diminution to the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C.

§1112(b)(4)(A).  See In re Haines, 2010 WL 252183, at *3 (W.D. Wash., Jan. 19, 2010) (affirming bankruptcy court's decision to dismiss the Chapter 11 case on the basis, among other reasons, that the debtor's estate was subject to continuing loss because the monthly financial statements showed "greater disbursements than receipts" and there was great delay in the filing of a plan and likelihood that such plan could not be confirmed); In re Gateway Access Solutions, Inc., 374 B.R. 556, 563-64 (Bankr. M.D. Pa. 2007) (cause existed under section 1112(b)(4)(A) where there was a sharp decline in debtor's cash position and no factual basis to support debtor's principal's testimony that debtor could reorganize).

The inquiry under section 1112(b)(4)(A) is two-fold:  First, the Court must determine whether there has been a substantial or continuing loss to the estate by evaluating the present condition of the Debtor.  Second, the Court must determine whether the Debtor is able to rehabilitate itself.  See In re Vallambrosa Holdings, L.L.C., 419 B.R. 81, 88-90 (Bankr. S.D. Ga. 2009) (noting that the section is written in the conjunctive and that both factors must be met); see also In re FRGR Managing Member LLC, 419 B.R. 576 (Bankr. S.D.N.Y. 2009).

When considering the first factor, "negative cash flow and inability to pay current expenses as they come due can satisfy the continuing loss or diminution of the estate standard."  In re Gateway Access, 374 B.R. at 564 (citing In re Adbrite Corp., 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003)); see also In re Vallambrosa Holdings, 419 B.R. at 89 (noting that accumulating administrative expenses were eroding the position of the estate's creditors and diminishing the value of the estate), In re FRGR Managing Member LLC, 419 B.R. at 581(same); In re Haines, 2010 WL 252183, at *3 (noting that the

monthly financing statement showed continuing net operating losses).

Here, the fact that there has been a continuing loss to or diminution to the Debtor's estate cannot be disputed. Substantially all of the Debtor's assets have been sold over two months ago, and the last monthly operating report that was filed with the Court reflects that the overall value of the Debtor's assets has diminished by over $15 million. Moreover, as the chart in Paragraph 23 above shows, the Debtor has operated at a loss since the Petition Date, and the cumulative net losses in this case are amount to over $22 million as of the end of 2009. Lastly, since the Sale Transaction was consummated, the Debtor and the Committee have retained, and are proposing to retain, more professionals which will add an additional layer to the administrative expenses related to the Chapter 11 proceeding, thus eroding the "pot" that is available for distribution to the creditors.

As to the second factor, courts have held that "[r]ehabilitation 'contemplates the successful maintenance or re-establishment of the debtor's business operations'" In re Vallambrosa Holdings, 419 B.R. at 89 (quoting Loop Corp. v. United States Trustee, 290 B.R. 108, 113 (D. Minn. 2003), aff'd 379 F.3d 511 (8th Cir. 2004) cert. denied 543 U.S. 1055 (2005)). Moreover, whether there is a likelihood of rehabilitation is not a "technical [test] of whether the debtor can confirm a plan, but rather, whether the debtor's business prospects justify continuance of the reorganization effort." Id. Here, because the Debtor is no longer operating, has sold substantially all of its assets, and is in the process of winding-down and distributing the remaining assets to creditors, there is no potential to rehabilitate the Debtor's business or re-establish its operations.

This is not a case where the Debtor has any prospect of successfully reorganizing its business. This is a case where there is a finite "pot" of funds for distribution to

creditors and all that is left to do is investigate and pursue any possible causes of action that would reduce claims asserted against the estate and possibly bring money into the estate, object to claims, and finally, distribute the remaining funds to the various creditors. All this can be done by a Chapter 7 trustee without having to pay the related administrative costs of the Chapter 11 proceeding, including the professional fees for proposing, soliciting, and seeking confirmation of a plan that would ultimately provide for the distribution of the same "pot" of funds.

While the Committee has indicated that it will be filing a plan of liquidation shortly, the administrative costs related with the confirmation of such plan would certainly exceed the administrative costs of a Chapter 7. Continuing in a Chapter 11 would mean that professional fees incurred by OMM, Clingman, Otterbourg, Follick (and possibly the Togut Firm and PwC) would continue at a hefty cost to the estate. In addition, the estate would have to bear the cost of soliciting the plan, negotiating with various parties any informal or formal objections filed, and having the plan confirmed. Moreover, quarterly fees owed to the United States Trustee (which amounted to $20,000 for the last quarter) would continue to accrue. Lastly, even following confirmation, the professional fees would continue and there is the possibility that the plan administrator would hire additional professionals to help him or her with the duties pursuant to the plan.

Against this backdrop, the appointment of a Chapter 7 trustee would eliminate some of the Chapter 11 costs including the UST fees, the costs of confirming a plan, and the multiple layers of attorneys retained in the Chapter 11 case. Undoubtedly, this would benefit all creditors in the estate as the funds available for distribution to them would not

continue to diminish as a result of the Chapter 11 administrative expenses.

**B.      Failure to File Operating Reports**

The Debtor's failure to submit timely operating reports also constitutes "cause" pursuant to Section 1112(b)(4)(H) of the Bankruptcy Code.  See In re Rey, 2006 WL 2457435, at *8 (Bankr. N.D. Ill. Aug. 21, 2006) (noting that a debtor' failure to submit operating reports is cause to convert or dismiss a case); In re Berryhill, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991) (failure to file operating reports constitutes cause for dismissal or conversion of Chapter 11 proceeding); In re Tornheim, 181 B.R. 161, 164 (Bankr. S.D.N.Y. 1995) ("Refusal or inability to provide financial disclosure sounds the death knell of a chapter 11 case.")  The rationale for such a rule was cogently explained by a Bankruptcy Court:

> Timely and accurate financial disclosure is the life blood of the Chapter 11 process.  Monthly operating reports are much more than busy work imposed upon a Chapter 11 debtor for no reason other than to require it to do something.  They are the means by which creditors can monitor a debtor's post-petition operations.  As such, their filing is very high on the list of fiduciary obligations imposed upon a debtor in possession.  Thus, the failure to file operating reports "in itself constitutes 'cause' for dismissal.

Berryhill, 127 B.R. at 433 (internal citations and quotations omitted); see also In re Kholyavka, 2008 WL 3887653, *4 (dismissing Chapter 11 case for cause under section 1112(b)(2)(F) and (H) and acknowledging that "accurate and complete financing information is necessary to determine whether a debtor is able to successfully reorganize.").  Here, the Debtor has not filed monthly operating reports since the December MOR.  Accordingly, the Court, the United States Trustee, all creditors, and

other parties in interest are being kept virtually in the dark concerning the Debtor's overall financial condition and the remaining assets left to be distributed.  This in itself constitutes sufficient "cause" warranting conversion of this case to Chapter 7.

## IV. CONCLUSION

WHEREFORE, the United States Trustee respectfully requests that the Court enter an order converting this case to a Chapter 7 and granting such other and further relief as may be deemed just and proper.

Dated: New York, New York
March 19, 2010

Respectfully submitted,

DIANA G. ADAMS
UNITED STATES TRUSTEE
By  */s/ Elisabetta G. Gasparini*
    Elisabetta G. Gasparini
    Trial Attorney
    33 Whitehall Street, 21st Floor
    New York, New York 10004
    Tel. No. (212) 510-0500
    Fax No. (212) 668-2255